OPINION
 

 By the Court,
 

 Shearing, J.:
 

 Alica Wegner, a licensed day care operator in Las Vegas, was convicted of first degree murder for the March 1997 death of fourteen-month-old Kierra Harrison. The district court sentenced Wegner to life in prison with the possibility of parole after twenty years. We reverse Wegner’s conviction and remand the case for a new trial because of flawed and omitted jury instructions.
 

 FACTS
 

 Kierra Harrison lived with her parents, Amanda and Seth Harrison, and a family friend, Adam Henderson, in a two-bedroom apartment in Las Vegas. In January 1997, Amanda decided to return to work, so she contacted Wegner to care for Kierra. Amanda hired Wegner to care for her daughter as of February 17, 1997.
 

 On February 25, 1997, Kierra received measles, mumps, and rubella vaccination shots. The evening following the vaccinations, Kierra began vomiting and was taken to the hospital by her parents. Kierra was released from the hospital and attended day care for the final three days of the work week. During those days, Kierra was not interested in eating but her health seemed to be improving. Over the weekend, Amanda testified, Kierra went to the park, played, and ate dinner.
 

 On Monday, March 3, 1997, Kierra arrived at Wegner’s house at approximately 7:30 a.m. Kierra was crying when she was dropped off. Wegner’s three children, ages six years, two years and six weeks, were also present. Around 4:00 p.m., Amanda received a phone call informing her that Kierra had fallen, that she might be experiencing a seizure, and that she was being taken to the hospital. When Seth arrived at Wegner’s house, Wegner told Seth that she had heard Kierra crying in the playroom. When
 
 *1151
 
 she went to the playroom, she found Kierra on the floor. Wegner stated that she picked her up and put her in a crib with a bottle. Later, Wegner checked on Kierra and found her turning a strange color, so she called the emergency 9-1-1 number.
 

 When the paramedics arrived at 4:05 p.m., they found Kierra unconscious and unresponsive. They checked her head for signs of trauma or swelling but found nothing. Kierra was then placed on mechanical ventilation.
 

 Wegner told the paramedics that the children had been roughhousing and that she thought the child might have fallen and hit her head. She said that Kierra had become “cranky,” so she put her in a bed with a bottle. One of the paramedics who spoke to Wegner, Brett Benson, testified that Wegner was upset, but not hysterical.
 

 Benson checked Kierra for head injuries in the ambulance on the way to the University Medical Center (UMC), but discovered nothing in that regard. Later, Benson returned to the hospital and noticed considerable swelling in the back of her head and neck that he did not recall seeing previously.
 

 Amanda testified that, upon seeing Kierra at the hospital, Kierra was pale, her eyes were closed, and the back of her head was swollen. After a CAT scan, Dr. John Anson (the examining physician) informed Amanda and Seth that Kierra’s skull was fractured and there was evidence of a possible blood clot. Although Kierra underwent surgery, she died on March 5, 1997. Wegner was subsequently arrested and charged with Kierra’s murder.
 

 Crime scene detectives and analysts found that the dining room, living room, and playroom all had normal carpeting on the floors. In a playpen there was a mattress and a variety of toys. In another room there was a crib with a mattress, one toy, and a bottle in it.
 

 At trial, Shellene Renteria and Jennifer Cerone testified that they were at Wegner’s day care operation on the afternoon of March 3rd. Renteria testified that she arrived at Wegner’s day care address shortly after 2:45 p.m. for an interview. Wegner showed Renteria the facilities, including the day care room, the kitchen, and the backyard. They discussed routines and fees. Wegner did not show Renteria the back bedrooms where the children were sleeping. Renteria stated that Wegner did not appear stressed. Renteria left around 3:30 p.m.
 

 Cerone testified that she arrived at Wegner’s around 4:00 p.m. on March 3rd. Wegner answered the doorbell with a limp Kierra in her arms. Wegner was trying to resuscitate the child in her arms, but the child was then placed on the floor and Cerone started CPR. They discovered that Kierra had a pulse and was breathing. Wegner asked Cerone to call Amanda to inform her of
 
 *1152
 
 Kierra’s medical emergency. Cerone testified that Wegner was crying and that she said something to the effect of “I hope this baby doesn’t die. I hope I didn’t do anything wrong.” Ten days later, after Cerone saw the news and formed opinions about the case, Cerone told the police that she thought Wegner’s crying was “an act.”
 

 Both parties at trial called expert witnesses to testify about Kierra’s injuries and the cause of those injuries. Two conflicting views with regard to the cause of Kierra’s death arose from the testimony of medical experts. The State’s witnesses generally testified that Kierra sustained a non-accidental trauma to the head on March 3rd causing a head fracture and hemorrhaging around the brain. Defense witnesses testified that pathological evidence of “macrophages” (indicating healing from an earlier injury) suggested that Kierra sustained an injury at least a few days before March 3rd. Reports from the Mayo Clinic and the Armed Forces Institute of Pathology (AFIP) supported this testimony. The defense experts testified that the initial injury may have spontaneously bled on March 3rd or may have been re-aggravated.
 

 Dr. Laurence Satkowiak, a pediatrician, treated Kierra in the UMC emergency room upon her arrival on March 3rd. He testified at trial that he initially did not see any bruising or swelling on Kierra’s head. His initial diagnosis was that Kierra had suffered from a “neurological devastation.” Dr. Satkowiak testified that a child injured like Kierra would at first be very fussy-screaming or crying — and then quickly start to lose consciousness, becoming more lethargic. A CAT scan showed that the back of Kierra’s skull was fractured, and a large collection of blood within the brain. Based upon the CAT scan information, Dr. Satkowiak concluded that Kierra had suffered a non-accidental injury within the last three to six hours. The doctor testified that Kierra’s high blood sugar level supported this diagnosis. Eventually, Dr. Satkowiak turned over Kierra’s care to Dr. Meena Vohra.
 

 Dr. Vohra, a pediatric intensive care specialist, testified about Kierra’s condition while she was at UMC. After viewing the CAT scan, Dr. Vohra testified that she concluded that Kierra’s injuries were non-accidental and probably occurred on March 3rd. Other than the skull fracture, Dr. Vohra did not see any other signs of injury or abuse.
 

 As the swelling in Kierra’s skull worsened on March 3rd, doctors at UMC determined that surgery was necessary. Dr. John Anson, a neurosurgeon, operated on Kierra. He testified that Kierra’s injuries probably occurred within the four hours prior to Kierra’s hospitalization. During surgery there was cerebellar tissue coming up through the skull fracture. Dr. Anson removed a sample of brain matter and blood. This sample was subsequently
 
 *1153
 
 sent to the Mayo Clinic and AFIP for analysis. Dr. Anson saw no evidence of a previous injury.
 

 Ultimately, the surgery was unsuccessful and Kierra was pronounced dead on March 5, 1997. Dr. Sheldon Green performed an autopsy of Kierra on March 6th. Dr. Green found no external signs of injury, however, internally Dr. Green found a skull fracture just left of center on the back of Kierra’s skull. The fracture showed a line going up and down and one towards the left ear. Dr. Green did not discover any evidence of healing and testified that the injury was caused by blunt force trauma. If the injury was caused by a fall, Dr. Green testified that it would have to be from a second story or about ten feet onto concrete.
 

 Other doctors reviewed Kierra’s medical file and/or the sample taken from Kierra during surgery. These reviews resulted in conflicting opinions among medical experts concerning the sample taken from Kierra during surgery. The Mayo Clinic reported that the slides taken from the sample showed reactive macrophages and not tumor cells (as it was first diagnosed). AFIP reported that the slides showed “reactive inflammatory infiltrate consistent with organizing hematoma.” Both reports suggested that an injury occurred before March 3rd.
 

 Dr. Jeffrey Johnson of Sunrise Hospital in Las Vegas testified that he reviewed the CAT scans and films of Kierra Harrison three weeks before trial. He stated that the injury was acute, but that he could not be certain about the time of the injury except that it probably occurred forty-eight hours or less before Kierra was brought to UMC.
 

 Dr. David Chadwick of the Child Protection Center at the Children’s Hospital in San Diego also reviewed Kierra’s file. He testified that the injury was non-accidental. He stated that although there are exceptions, for a child to incur a similar injury, a fall of over ten feet was necessary. Dr. Chadwick testified that he thought Kierra must have been slammed backwards into something to cause the fracture. He did not believe that the injury could have taken place more than twenty-four hours before Kierra arrived at UMC, but that it must have occurred at some time on March 3rd.
 

 Dr. Lucy Rorke from Children’s Hospital in Philadelphia testified that Kierra’s injuries were acute and consistent with non-accidental trauma. The autopsy revealed retinal hemorrhages, which Dr. Rorke believed to be caused by blunt trauma to the head. Dr. Rorke testified that the sample of cerebellar tissue and blood taken by Dr. Anson did not reveal macrophages but only “degenerated internal granular cells.” Thus, Dr. Rorke testified that Kierra’s injuries probably occurred on March 3rd. Dr. Rorke stated that if the sample tissue contained macrophages, the injury could not have occurred on March 3rd.
 

 
 *1154
 
 Dr. Mary Case, a medical examiner for St. Louis, Missouri, testified that Kierra’s injuries were acute and consistent with non-accidental trauma. She also testified that the sample taken by Dr. Anson was of cerebellum material and blood. Like Dr. Rorke, Dr. Case testified that the sample did not include macrophages and that Kierra’s injury probably took place on March 3rd. Dr. Case testified that macrophages do not develop for two or three days. Thus, if they were present, Kierra’s injury could not have occurred on March 3rd. Dr. Case further testified that Kierra’s injury was probably caused by acceleration and then deceleration of the brain — basically that her head was impacted with a blunt object. Dr. Case testified that these injuries are associated with retinal hemorrhages, but that falls do not usually cause retinal hemorrhages.
 

 Dr. Marietta Nelson, a pediatric ophthalmologist, who reviewed only the autopsy reports, testified that the retinal hemorrhages were a classic sign of shaken baby syndrome. Dr. Nelson testified that the injury was of a non-accidental nature with hemorrhages that must have appeared quickly after the injury.
 

 Dr. Craig Voss, a pathologist at UMC, is the doctor who sent Kierra’s samples to the Mayo Clinic and then to AFIP for second opinions. At first, Dr. Voss believed the samples showed an oligo-dendroglioma or brain tumor. After reading the reports from the Mayo Clinic and AFIP, Dr. Voss changed his opinion and adopted the findings of the Mayo Clinic and AFIP, that Kierra sustained an injury more than a few days before she arrived at the trauma center.
 

 Dr. Barbara Wolf, an expert in forensic pathology, testified that the sample cells prepared by Dr. Voss, which were sent to the Mayo Clinic and AFIP, exhibited macrophages. Dr. Wolf explained that the number of macrophages present in the sample would take a minimum of forty-eight hours to develop. The specialized staining of the slide sample by the Mayo Clinic and AFIP was negative for internal granular tissue. Dr. Wolf testified that after the initial injury, Kierra’s injury could re-bleed spontaneously or with minor trauma. Finally, Dr. Wolf stated that the initial trauma would not necessarily have rendered Kierra immediately unconscious.
 

 Dr. Robert Cantu, Director of Pediatric Neurosurgery at Boston City Hospital, testified that the degree of the injury shown in the first CAT scan was more extensive than he thought would be evident from an injury occurring just a few hours previously. Dr. Cantu testified that in his opinion if the injury was as recent as March 3rd, there would have been external evidence of the injury on Kierra’s skull. Thus, one of the possibilities, Dr. Cantu stated, was that Kierra sustained a skull fracture days earlier and the
 
 *1155
 
 scalp healed. Dr. Cantu testified that the blood clot removed from Kierra’s head, which was initially described as a brain tumor, suggested that “reactive changes” were ongoing for a period of days. Dr. Cantu also testified that he saw skull fractures in children where the falls were not from a great height. Dr. Cantu testified that there were inconsistencies in the medical evidence that would make it difficult for anybody to be absolutely sure that all of Kierra’s injuries occurred on March 3rd.
 

 DISCUSSION
 

 The State charged Wegner with first degree murder under NRS 200.030(1). At the time of the injury and trial, subsection (a) of that statute stated that murder in the first degree is murder which is “[pjerpetrated by means of poison, lying in wait, torture or child abuse, or by any other kind of willful, deliberate and premeditated killing.” NRS 200.030(6)(a) defines child abuse as “physical injury of a nonaccidental nature to a child under the age of 18 years.”
 

 Jury instruction on malice aforethought
 

 Wegner contends that the jury instructions in this case created an unconstitutional mandatory presumption of malice aforethought, which incorrectly relieved the State of its burden to prove every element of the crime charged.
 

 Jury instruction number 8 stated:
 

 There are certain classes of murder which carry with them
 
 conclusive evidence of malice aforethought.
 
 One of these classes of murder is
 
 murder committed by means of child abuse.
 
 Therefore, a killing which is committed by child abuse is deemed to be murder of the first degree whether the killing was intentional or unintentional.
 

 This instruction is erroneous.
 
 See
 
 Collman v. State, 116 Nev. 687, 7 P.3d 426 (2000).
 

 We now turn to the question of whether giving the erroneous jury instruction is harmless error. Erroneous jury instructions are reviewable according to a harmless-error analysis.
 
 Id.
 
 at 722-23, 7 P.3d at 447 (citing Neder v. United States, 527 U.S. 1, 13-15 (1999)). An error is harmless when it is “clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.”
 
 Neder,
 
 527 U.S. at 18. Moreover,
 
 Neder
 
 concluded that jury instruction errors are subject to a harmless-error analysis if they do not involve the type of jury instruction
 
 *1156
 
 error which “vitiates all the jury’s findings” and produces “consequences that are necessarily unquantifiable and indeterminate.’ ’
 
 Id.
 
 at 10-11 (citing Sullivan v. Louisiana, 508 U.S. 275, 281-82 (1993)). Where a defendant has contested the omitted element and there is sufficient evidence to support a contrary finding, the error is not harmless.
 
 Id.
 
 at 19.
 

 In
 
 Coliman,
 
 the jury instruction error was determined to be harmless beyond a reasonable doubt. The same cannot be said for this case. In both cases other instructions informed the jury that malice aforethought was a necessary element of the crime of first degree murder. Other factors distinguish this case from
 
 Coliman,
 
 however, and prevent a conclusion that the error was harmless beyond a reasonable doubt.
 

 Most notably, the
 
 Coliman
 
 jury also found that Coliman tortured the victim, while such a finding is neither present nor supported by any evidence in this case. In
 
 Coliman,
 
 this court determined that the jury’s unanimous finding of torture beyond a reasonable doubt showed that the jury also found implied malice.
 
 Id.
 
 at 724, 7 P.3d at 450. There was no such finding in this case.
 

 Furthermore, this case involves only one instance of alleged child abuse. In
 
 Coliman,
 
 there was evidence of repeated child abuse. The
 
 Coliman
 
 opinion warns that a malice instruction is necessary to avoid the circumstance where a single abusive impulsive act by an otherwise decent caretaker would lead to a first degree murder conviction.
 

 This case also lacks overwhelming evidence of guilt. The case against Wegner relies almost exclusively on the medical evidence. The various medical experts provided conflicting testimony. Some of the medical testimony suggested that the victim may have already been injured before being placed in Wegner’s care. The jury may have concluded that Wegner committed child abuse, aggravating a previous injury without malice aforethought.
 

 It is not clear beyond a reasonable doubt that the jury would have found Wegner guilty of first degree murder absent the erroneous jury instruction. This court cannot conclude that the error was harmless and therefore Wegner’s conviction must be reversed.
 

 The involuntary manslaughter instruction
 

 Wegner argues that it was error for the district court to deny her request for an involuntary manslaughter instruction. A defendant is entitled to a lesser-included offense instruction when the theory of the defense is consistent with a conviction for the lesser offense.
 
 See
 
 Walker v. State, 110 Nev. 571, 575, 876 P.2d 646, 649 (1994). Furthermore, in Williams v. State, 99 Nev. 530, 531,
 
 *1157
 
 665 P.2d 260, 261 (1983), we held that “[i]f a defense theory of the case is supported by some evidence which, if believed, would support a corresponding jury verdict, failure to instruct on that theory totally removes it from the jury’s consideration and constitutes reversible error.” In Graham v. State, 116 Nev. 23, 29, 992 P.2d 255, 258 (2000), we held that a district court need not instruct a jury on deliberation, premeditation, or second degree murder when first degree murder is charged pursuant to one of the specifically enumerated categories of NRS 200.030(1). However, we noted in
 
 Graham,
 
 in
 
 obiter dictum,
 
 that it would be error to refuse a jury instruction on involuntary manslaughter where proofs are consistent with such a theory of criminal culpability.
 

 Here, evidence provided at trial revealed that Kierra’s death may have occurred from circumstances supporting an involuntary manslaughter conviction. Defense medical experts testified that macrophages present in a sample taken from the area near Kierra’s skull fracture suggest that the injury occurred days before March 3rd and that Kierra’s injury may have been aggravated on March 3rd. According to the evidence, this aggravation could have occurred during a fall, or by some other mechanism besides child abuse. In such a circumstance, Kierra’s death would not have been a product of malice aforethought but possibly a result of neglect or endangerment. Because there is some evidence to support an instruction on involuntary manslaughter, the district court’s removal of the theory from the jury’s consideration constitutes error.
 

 Wegner also cited numerous instances of prosecutorial misconduct, including arguing facts not supported by the evidence and improper vouching for the strength of the State’s case. In view of the disposition in this case, we do not discuss them, but we assume such arguments will not be made in any retrial.
 

 CONCLUSION
 

 The improper jury instruction on malice aforethought and the omission of the involuntary manslaughter jury instruction mandate reversal of Wegner’s conviction. Where the issue of guilt must be determined by an evaluation of directly contradictory expert testimony, errors such as those discussed above deprive Wegner of her right to due process. Thus, we remand this case for a new trial.
 

 Maupin and Becker JJ., concur.