## CHRISTOPHER STEVEN NAY, Appellant, v. THE STATE OF NEVADA, Respondent.

### No. 45276

September 20, 2007

167 P.3d 430

*Philip J. Kohn*, Public Defender, and *Charles A. Cano* and *Scott L. Coffee*, Deputy Public Defenders, Clark County, for Appellant.

*Catherine Cortez Masto*, Attorney General, Carson City; *David J. Roger*, District Attorney, and *Lynn M. Robinson* and *James Tufteland*, Chief Deputy District Attorneys, Clark County, for Respondent.

Before the Court EN BANC.

## OPINION

By the Court, CHERRY, J.:

The primary issue in this appeal is whether a defendant may be found guilty of first-degree felony murder if the intent to commit the predicate enumerated felony arises after the conduct resulting in death. We answer that question in the negative and adopt the majority position that for purposes of the first-degree felony-murder statute, the intent to commit the predicate enumerated felony must have arisen before or during the conduct resulting in death. In this case, the district court erred in refusing to so instruct

the jury, as the defense had requested. Under the circumstances presented, the error cannot be considered harmless with respect to the first-degree murder conviction. We therefore reverse the judgment as to that conviction. We affirm the conviction for robbery with the use of a deadly weapon.

## FACTS AND PROCEDURAL HISTORY

The State charged appellant Christopher Steven Nay with first-degree murder and robbery, both with the use of a deadly weapon. The State alleged that Nay beat his roommate Elijah Ansah to death with a baseball bat and took his money, marijuana, and handgun. Nay claimed that he acted in self-defense and only decided to take Ansah's property after he believed Ansah was dead. The following evidence was presented at trial.

Christopher Nay met Elijah Ansah in April 2003. Ansah had been living a transient lifestyle, staying with various friends and relatives. A few months after meeting Nay, Ansah moved in with him in June 2003.

At 6:45 a.m. on July 27, 2003, Ansah's body was discovered by two hikers at Lone Mountain in Northwest Las Vegas. He had suffered blunt force injuries to his head and body, and it appeared that he had been set on fire postmortem. Additionally, Ansah had a near-fatal level of hydrocondone in his system.[1] Ansah's body could not initially be identified, so authorities released a news report and pictures of the body.

When interviewed by police, Nay admitted to killing Ansah. Nay gave police the following account of events leading up to Ansah's death. Early in the morning on July 27, Nay and Ansah went to Lone Mountain. Ansah had wanted to go meet some girls, and one of Ansah's friends drove them there.[2] Nay brought a bat for protection.[3]

After they were dropped off, Ansah and Nay walked toward the back of the mountain, where they waited for the girls. They were

---

[1]Hydrocondone is a narcotic analgesic that would make a person drowsy, tired, uncoordinated, or a "little high."

[2]According to Joshua McCrarey, one of Nay's friends, Nay called him after 11:00 p.m. on July 26 and asked for a ride to Lone Mountain. McCrarey drove Nay and Ansah to Lone Mountain at approximately 12:30 or 1:00 a.m. McCrarey testified that it appeared to be Nay's idea to go meet the girls. Although Nay asked McCrarey to wait for approximately twenty minutes after dropping them off, McCrarey left after fifteen minutes.

[3]Although Nay claimed he got the bat from his friend, Michael Eaton, to protect himself from a gang member, Eaton claimed that Nay was not specific about why he wanted the bat and made a joke about using it to pull a "lick"—catching someone off guard, knocking them out, and quickly taking their possessions. Eaton did not take the comment seriously.

the only two in the park. After approximately twenty minutes, Nay repeatedly asked Ansah where the girls were. At that point, Ansah pulled out a handgun and pointed it at Nay.[4]

Nay thought Ansah might be playing around because Ansah had previously pointed an unloaded handgun at him. But when Nay told Ansah to quit playing, Ansah allegedly replied, "We ain't in your apartment no more. I ain't f___ing playing this time." He then cocked the handgun. Nay kicked Ansah in the stomach. Ansah buckled and almost fell before he fired the handgun. Nay then swung his bat and hit Ansah in the back of the head. After Ansah fell to the ground, Nay continued hitting him in the back of the head with the bat. Nay hit him in the head five to eight times because his adrenaline was pumping and he did not want Ansah to get back up and shoot him. In the course of hitting Ansah with the bat, Nay also kicked him a few times in the ribs.

After realizing that he may have killed Ansah, Nay became scared. He attempted to burn Ansah's shirt with a cigarette lighter. He took Ansah's shoes out of concern that his fingerprints might be on them and because he did not want to be charged with murder. He took Ansah's pants so that he could go through the pockets. He figured he "may as well get something" since Ansah had held a gun to his head, and he wanted Ansah's money, marijuana, and his handgun. Nay claimed that he took the handgun because he did not know whether Ansah was dead and did not want Ansah to shoot him. Although Nay indicated during a police interview that the handgun was in Ansah's pants, he became upset and said the gun was not in Ansah's pants but that Ansah usually kept the gun there. Nay stated that he had no intention to rob or kill Ansah.

Nay took the pants, shoes, money, marijuana, and the handgun and walked to his apartment. He discarded his clothes and Ansah's clothes in a dumpster. He did not turn himself in immediately because he did not want to be locked up for murder when he was just defending himself.

After the killing, Nay made comments to friends and acquaintances indicating that he had used a bat to commit a robbery. According to Nay's friend Manuel Martinez, Nay claimed that he had used the bat in a "lick"—which refers to catching someone off guard, knocking them out, and taking their possessions. Nay also showed the handgun to Martinez and another friend and said that it came from a "lick." Martinez thought that Nay was bragging to get street credibility. According to Nay's friend Joshua McCrarey, after the night of the killing, Nay told McCrarey that Ansah's for-

---

[4]According to trial testimony, with the level of hydrocondone that Ansah had in his system, he would not have had complete control of his body, but he could have held a gun and pointed it at someone.

mer roommate had found Ansah and killed him. But Nay also had a lot of money and told McCrarey that he had "jumped" Ansah to get the money.

Sometime after the discovery of Ansah's body, Nay and several of his friends drove by Lone Mountain. Nay, who did not usually have much cash, had a bag of marijuana, a handgun, and $600 to $1000 cash. According to Nay's friend Michael Eaton, Nay said that he got the marijuana, handgun, and cash from a "lick" on Ansah. As they drove past Lone Mountain, Nay made a sarcastic comment about the Las Vegas Metropolitan Police Department (LVMPD) thinking that the recent killing at Lone Mountain was gang related. Later, the group began making up their own rap lyrics. Nay's lyrics included, "I bashed someone over the head, now he lies dead behind Lone Mountain." The next morning Branden Lillegaard, Martinez, Eaton, and an individual simply referred to as Lorenzo talked about what Nay had said. They contacted the LVMPD regarding their suspicions that Nay may have killed Ansah.

The jury found Nay guilty of first-degree murder with the use of a deadly weapon and robbery with the use of a deadly weapon. Nay was sentenced to two consecutive terms of life in prison with eligibility for parole for his murder of the first degree with the use of a deadly weapon conviction and two 35- to 156-month sentences for the robbery with the use of a deadly weapon conviction. He now appeals from the judgment of conviction.

## DISCUSSION

On appeal, Nay argues that the district court abused its discretion when it refused to instruct the jury that a robbery committed as an afterthought to a murder cannot support a felony-murder conviction. The State contends that the proffered instruction misstated the law in Nevada. We have recognized that "while the defense has the right to have the jury instructed on its theory of the case as disclosed by the evidence," the defendant "is not entitled to an instruction which incorrectly states the law or that is substantially covered by other instructions."[5]

We generally review a district court's refusal to give a jury instruction for an abuse of discretion or judicial error.[6] But whether a proffered instruction is a correct statement of the law presents a legal question which we review de novo.[7] Whether robbery may

---

[5]*Barnier v. State*, 119 Nev. 129, 133, 67 P.3d 320, 322 (2003) (footnotes and quotations omitted).

[6]*Jackson v. State*, 117 Nev. 116, 120, 17 P.3d 998, 1000 (2001).

[7]*Garcia v. State*, 117 Nev. 124, 127, 17 P.3d 994, 996 (2001).

support felony murder when the perpetrator does not form the intent to rob the victim until after the victim has been killed (afterthought robbery) is an issue of first impression for this court.[8]

Whether robbery may serve as a predicate for felony murder when the perpetrator formed the intent to rob after killing the victim is a question of statutory interpretation. This court "must attribute the plain meaning to a statute that is not ambiguous."[9] Ambiguity is found "where the statutory language lends itself to two or more reasonable interpretations."[10] When ambiguity arises, "[c]riminal statutes must be 'strictly construed and resolved in favor of the defendant.'"[11]

NRS 200.030(1)(b) defines felony murder as murder which is "[c]ommitted in the perpetration or attempted perpetration of . . . robbery." The statute does not define "perpetration or attempted perpetration." Nay argues that if he had not formed any intent to commit robbery at the time he killed Ansah, then the killing could not have been "in the perpetration of" the robbery. The State argues that intent is irrelevant and, as force or violence is required for robbery, the force or violence used to kill the victim is "in the perpetration of" the robbery.[12] As both interpretations are reasonable, the statute is ambiguous.[13]

Several other states have considered afterthought robbery in the context of felony murder. The majority view "is that in order for the felony-murder doctrine to be invoked, the actor must intend to commit the underlying felony at the time the killing occurs; there

---

[8]We concluded in *Leonard v. State* that a person who takes property from a victim after he is dead still commits robbery, and we will not revisit that decision. 117 Nev. 53, 76-77, 17 P.3d 397, 412 (2001).

[9]*State v. Catanio*, 120 Nev. 1030, 1033, 102 P.3d 588, 590 (2004).

[10]*Id.*

[11]*Firestone v. State*, 120 Nev. 13, 16, 83 P.3d 279, 281 (2004) (quoting *Anderson v. State*, 95 Nev. 625, 629, 600 P.2d 241, 243 (1979)).

[12]The State argues that this court already determined that afterthought robbery may serve as a predicate to felony murder in *Thomas v. State* when this court stated,

> Thomas asserts next that the instructions should have stated that if the intent to rob was not formed until after the murders, then a robbery did not occur and the felony-murder rule did not apply. But the facts in *Thomas* clearly showed that the intent to rob preceded the murders. Moreover, "in robbery cases it is irrelevant when the intent to steal the property is formed."

120 Nev. 37, 46, 83 P.3d 818, 824 (2004) (quoting *Chappell v. State*, 114 Nev. 1403, 1408, 972 P.2d 838, 841 (1998)). The intent to rob in *Thomas* preceded the murders, thus, even if the State's interpretation of the above passage was correct, the passage is dicta as applied to afterthought robbery.

[13]*State v. Kopp*, 118 Nev. 199, 202, 43 P.3d 340, 342 (2002).

is no felony-murder where the felony occurs as an afterthought following the killing."[14]

The majority view is based on the felony-murder doctrine's purpose.[15] The purpose of the felony-murder rule is "to deter dangerous conduct by punishing as a first degree murder a homicide resulting from dangerous conduct in the perpetration of a felony, even if the defendant did not intend to kill."[16] The rule may deter a person from committing the felony itself or deter a person from committing the felony in a violent manner.[17] Thus, if an accused does not have the "intent to commit the underlying felony at the time of the killing, the basis for the felony-murder rule does not apply."[18] The majority view also recognizes that the deterrent effect ends once a victim has died—"'[w]here . . . the trier of fact determines that the accused, at the time of the killing, has not formed the intent to commit the felony, a rule designed to deter commission of a contemplated felony can have no effect.'"[19]

Also influencing the majority view is the legal fiction underlying the felony-murder rule—that the intent to commit the felony supplies the malice for the murder. "Murder is the unlawful killing of a human being . . . [w]ith malice aforethought, either express or implied."[20] With respect to felony murder, malice is implied by the intent to commit the underlying felony.[21] Thus, to imply malice for the purposes of felony murder, the accused must intend to commit the robbery at the time of the killing.

The minority view is that where the robbery and murder are part and parcel of one continuous action, then the felony-murder doctrine does apply.[22] Courts taking this view have determined that the

---

[14]*State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999) (summarizing cases stating the majority position); *see also State v. Allen*, 875 A.2d 724, 729-30 (Md. 2005); *Com. v. Spallone*, 406 A.2d 1146, 1147-48 (Pa. Super. Ct. 1979).

[15]*Allen*, 875 A.2d at 729-30; *Buggs*, 995 S.W.2d at 107.

[16]*Allen* 875 A.2d at 729.

[17]*Id.* at 729-30; *Buggs*, 995 S.W.2d at 107.

[18]*Buggs*, 995 S.W.2d at 107.

[19]*Metheny v. State*, 755 A.2d 1088, 1115 (Md. 2000) (quoting *Spallone*, 406 A.2d at 1148).

[20]NRS 200.010.

[21]*Collman v. State*, 116 Nev. 687, 715, 7 P.3d 426, 444 (2000).

[22]*State v. Williams*, 660 N.E.2d 724, 732-33 (Ohio 1996); *Perry v. State*, 853 P.2d 198, 200 (Okla. Crim. App. 1993); *Hightower v. State*, 901 P.2d 397, 402 (Wyo. 1995); *see also Allen*, 875 A.2d at 730 (discussing the minority rule); *Buggs*, 995 S.W.2d at 107 (discussing the minority rule).

felony-murder doctrine does not explicitly require the intent to commit the underlying felony to be formed before or contemporaneously with the murderous act.[23] Instead, they apply a res gestae theory—as long as the murderous act is "part and parcel" of the same transaction as the felony, then when the intent to commit the underlying felony was formed is irrelevant and the felony-murder rule applies.[24]

We conclude the minority view suffers from two flaws: a lack of prior intent to commit the predicate felony and an expansion of the felony-murder doctrine. First, if an accused lacks the intent to commit the predicate felony at the time of the killing, then no malice is supplied to support murder. Developing the intent to commit a predicate felony after the killing does not, after the fact, supply the requisite malice for murder because there must be a unity of act and intent to commit any crime.[25] Second, the minority view expands the felony-murder doctrine when, as we recognized in *Collman v. State*, "the weight of authority calls for restricting it."[26] Indeed, the felony-murder rule loses its traditional deterrent purpose of discouraging felonious conduct or the use of violence in committing a felony where the intent to commit the felony only arises as an afterthought to a killing.

We conclude that the majority view is the better view. Robbery does not support felony murder where the evidence shows that the accused kills a person and only later forms the intent to rob that person. However, in determining whether a defendant had the requisite intent to commit an enumerated predicate felony before or during a killing, the fact-finder may infer that intent from the defendant's actions during and immediately after the killing.[27] In this case, the failure to properly instruct the jury amounts to judicial error.

*Harmless error*

Having concluded that the district court erred, we must determine whether that error is harmless. We have explained that "jury instruction errors are subject to a harmless-error analysis if they do not involve the type of jury instruction error which 'vitiates all the jury's findings' and produces 'consequences that are necessarily

[23]*Williams*, 660 N.E.2d at 732-33; *Allen*, 875 A.2d at 730.

[24]*Allen*, 875 A.2d at 730 (describing minority reasoning).

[25]*Labastida v. State*, 115 Nev. 298, 307-08, 986 P.2d 443, 449 (1999); NRS 193.190.

[26]116 Nev. 687, 717, 7 P.3d 426, 445 (2000).

[27]*State v. Buggs*, 995 S.W.2d 102, 108 (Tenn. 1999).

unquantifiable and indeterminate.' ''[28] We conclude that the jury instruction error in this case is amenable to harmless-error review. As we have explained, ''[a]n error is harmless when it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' ''[29]

In this case, the jury was instructed that robbery is a predicate felony for the purposes of felony murder but received no instruction on afterthought robbery in the context of felony murder. The jury was further instructed that for purposes of robbery, ''[i]t is irrelevant . . . when the intent to steal property from the victim is formed.'' The State used these instructions in closing arguments, observing that ''[i]f he committed that robbery then he is guilty of felony murder.'' Given this argument and the instructions, the jurors had no way of arriving at the conclusion that afterthought robbery cannot provide the predicate felony for felony murder. ''Jurors should neither be expected to be legal experts nor make legal inferences with respect to the meaning of the law; rather, they should be provided with applicable legal principles by accurate, clear, and complete instructions specifically tailored to the facts and circumstances of the case.''[30]

Moreover, the jury verdict forms did not differentiate between felony murder and first-degree murder. Therefore, it is not clear whether the jury determined that Nay had the intent to rob Ansah prior to killing him or concluded that Nay killed Ansah with premeditation. Therefore, we conclude that it is not possible to determine beyond a reasonable doubt that the jury would have convicted Nay of first-degree murder if it had been properly instructed. However, we further conclude that the error did not impact the robbery conviction because robbery can occur after death,[31] and the jury was presented with overwhelming evidence to support the robbery charge, including Nay's admission that he robbed Ansah.

## CONCLUSION

We adopt the majority rule that the felony-murder doctrine requires that the actor must intend to commit the predicate enumerated felony before or at the time the killing occurred. A conviction for felony murder will not stand if the jury finds the felony oc-

---

[28]*Wegner v. State*, 116 Nev. 1149, 1155-56, 14 P.3d 25, 30 (2000) (quoting *Neder v. United States*, 527 U.S. 1, 10-11 (1999)).

[29]*Id.*

[30]*Crawford v. State*, 121 Nev. 744, 754, 121 P.3d 582, 588 (2005).

[31]*Leonard v. State*, 117 Nev. 53, 76, 17 P.3d 397, 412 (2001).

curred as an afterthought to the killing. Additionally, we hold that the failure to properly instruct the jury in this case was not harmless error with respect to the first-degree murder conviction. Thus, we affirm the judgment as to the conviction for robbery with the use of a deadly weapon and reverse the judgment as to the conviction for first-degree murder with the use of a deadly weapon, and we remand this matter to the district court.

GIBBONS, PARRAGUIRRE, DOUGLAS and SAITTA, JJ., concur.

MAUPIN, C. J., with whom HARDESTY, J., agrees, concurring:

I concur in the result reached by the majority. I write separately to address the majority's criticism of the district court in this matter.

The majority forcefully indicates that, based upon the State's argument and the instructions given, "the jurors had no way of arriving at the conclusion that afterthought robbery cannot provide the predicate felony for felony murder," and that " '[jurors] should be provided with *applicable legal principles* by accurate, clear, and complete instructions specifically tailored to the facts . . . of the case.' "[1] This implies that the district court somehow should have known not to commit the error we have now identified "as a matter of first impression." In my view, the district court did attempt to follow existing "applicable legal principles."

To begin, the basis of the district court's rejection of Nay's afterthought robbery instruction arguably came from this court. Certainly, the district court could have reasonably determined that, as a matter of law, our decision in *Thomas v. State*[2] precluded use of a jury instruction stating that an afterthought robbery does not implicate the felony-murder rule. As noted by the majority, we made the following statement in *Thomas*:

> Thomas asserts next that the instructions should have stated that if the intent to rob was not formed until after the murders, then a robbery did not occur and the felony-murder rule did not apply. But the facts in Thomas clearly showed that the intent to rob preceded the murders. Moreover, *"in robbery cases it is irrelevant when the intent to steal the property is formed."*[3]

A close reading of this passage makes it unclear, in retrospect, what we were trying to say in this portion of the opinion. A fair assessment of this language would indicate that the felony-murder

---

[1] *See* majority opinion *ante* p. 334 (emphasis added) (quoting *Crawford v. State*, 121 Nev. 744, 754, 121 P.3d 582, 588 (2005)).

[2] 120 Nev. 37, 83 P.3d 340 (2002).

[3] *Id.* at 46, 83 P.2d at 824 (emphasis added) (quoting *Chappell v. State*, 114 Nev. 1403, 1408, 972 P.2d 838, 841 (1998)).

rule is implicated even where the intent to commit robbery is not formed until after the victim has been killed. However, to the extent that we were attempting to convey such a proposition in *Thomas*, we improperly relied upon our previous decision in *Chappell v. State*.[4] First, it is clear that the emphasized language taken from *Chappell* referred to the intent necessary to commit the crime of robbery itself. Second, the discussion in that case to which the emphasized observation in *Thomas* refers had absolutely no bearing upon the timing of the formation of the intent to commit robbery necessary to implicate the felony-murder rule. What we have done today is to clarify *Thomas* by expressly embracing the majority position on this question. We should acknowledge our mistake,[5] rather than impliedly criticizing the district court for acting in accordance with that mistake.[6]

Because the felony-murder statute is reasonably susceptible to two inconsistent interpretations, we must apply the rule of ''lenity'' and interpret the measure as the majority has done today.[7]

---

[4]114 Nev. 1403, 972 P.2d 838.

[5]I realize that the author of the majority was not on the court when *Thomas* was decided. However, his authored opinion speaks for the court as a whole.

[6]The majority correctly notes that, to the extent that *Thomas* could be read to embrace the minority position on afterthought robberies, that embrace constituted obiter dictum. But district courts are entitled to assume that our dicta does state the ''applicable law.''

[7]*See Firestone v. State*, 120 Nev. 13, 16, 83 P.3d 279, 281 (2004) (reiterating that criminal statutes must be strictly construed in favor of the accused).