VANNASONE OUANBENGBOUNE, aka VANNASONE QUAN-BENGBOUNE, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 44763

December 3, 2009                                    220 P.3d 1122

[Rehearing denied March 9, 2010]
[En banc reconsideration denied July 20, 2010]

*Philip J. Kohn*, Public Defender, and *Sharon G. Dickinson*, Deputy Public Defender, Las Vegas, for Appellant.

*Catherine Cortez Masto*, Attorney General, Carson City; *David J. Roger*, District Attorney, *Steven S. Owens*, Chief Deputy District Attorney, and *Christopher J. Owens*, Deputy District Attorney, Clark County, for Respondent.

Before HARDESTY, C.J., PARRAGUIRRE and DOUGLAS, JJ.

## OPINION

By the Court, HARDESTY, C.J.:

In this appeal, we consider two issues. First, we review the circumstances under which inaccurate translations made during trial by a court-appointed interpreter warrant a new trial when such inaccuracies are discovered post-judgment. In doing so, we examine the procedures that should be employed to determine whether post-judgment discovery of inaccuracies made by a court-appointed interpreter fundamentally altered the context of the trial testimony, and whether the inaccuracies prejudiced the defendant such that a new trial is warranted. We therefore adopt procedures similar to the ones we adopted in *Baltazar-Monterrosa v. State*, 122 Nev. 606, 616-17, 137 P.3d 1137, 1144 (2006), to resolve claims of interpreter errors discovered post-judgment.

On appeal, Vannasone "Sonny" Ouanbengboune (Sonny) hired an independent interpreter to compare a tape-recording of his trial testimony to the transcript of the translated testimony. Based upon that

review, Sonny argues that his constitutional rights were violated because he was convicted based upon the court-appointed interpreter's improper translation of his testimony. We disagree. After considering the disputed versions of Sonny's testimony, we conclude that although certain inaccuracies did fundamentally alter the context of Sonny's testimony, these inaccuracies did not prejudice Sonny such that a new trial is warranted.

Second, we consider whether the district court's failure to instruct the jury on afterthought robbery amounts to reversible error. We conclude that the district court erred when it failed to instruct the jury on afterthought robbery but that error does not rise to the level of plain error as the error did not affect Sonny's substantial rights. We therefore affirm the district court's judgment of conviction.

## FACTS

Sonny emigrated from Laos to the United States in 1980. Between 2001 and 2003, Sonny maintained a romantic relationship with Raynna Bunyou. Their relationship deteriorated, and on August 7, 2003, Sonny took a bus to a lounge in Las Vegas to confront Raynna about alleged lies she had told him. He brought a revolver with him and testified that it was his intent to commit suicide in front of Raynna to prove his love to her. An argument ensued outside the lounge. At some point during the argument, Sonny produced the revolver and shot Raynna in the leg whereupon she fell to the ground near his feet. When patrons inside the lounge came outside to view the scene, Sonny pointed the gun towards the patrons and ordered them to go back inside. Sonny then shot Raynna in the head. He testified at trial that he did not aim the gun at Raynna's head when he fired the second shot.

After shooting Raynna the second time, Sonny drove Raynna's car from the scene. Subsequently, Sonny contacted his family members and traveled to Oklahoma City where he was ultimately arrested. Once in custody, Sonny gave a written statement to the FBI and allowed two Las Vegas Metropolitan Police officers to conduct a tape-recorded interview.

During trial, a court-appointed Laotian interpreter interpreted the proceedings for Sonny and interpreted Sonny's testimony for the jury. Although Sonny did not formally object at trial to specific interpreter errors made during trial, concerns about the adequacy of the translation were brought to the district court's attention during Sonny's testimony, and the interpreter was admonished during trial to properly translate the entire proceedings and everything the parties said.

The jury found Sonny guilty of first-degree murder with the use of a deadly weapon and robbery with the use of a deadly weapon. After he was convicted, Sonny hired an independent interpreter to

compare a tape-recording of his trial testimony to the court transcription. He now appeals from the judgment of conviction.

## DISCUSSION

### *Inaccuracies made during trial by court-appointed interpreter*

On appeal, Sonny argues that he was convicted after the court-appointed interpreter mistranslated his trial testimony.[1] Sonny claims that the inaccuracies in translation materially altered his testimony and his right to a fair trial under the Due Process Clause of the Fourteenth Amendment. We disagree.

In Nevada, criminal defendants who do not understand the English language have "a due process right to an interpreter at all crucial stages of the criminal process." *Ton v. State*, 110 Nev. 970, 971, 878 P.2d 986, 987 (1994). When we review the translation of testimony, we consider whether the translation was adequate and accurate in its entirety. *Baltazar-Monterrosa v. State*, 122 Nev. 606, 614, 137 P.3d 1137, 1142 (2006). We have not previously considered under what standard the adequacy of an interpreter's performance will be reviewed when translation errors are discovered post-judgment nor have we considered the prejudice that must be shown when fundamental translation errors have been discovered.

In *Baltazar-Monterrosa v. State*, we declared the standard for judicial review of the admissibility of disputed translated statements made by a defendant to police. 122 Nev. at 616-17, 137 P.3d at 1144. We clarified in *Baltazar-Monterrosa* that while interpreters are not required to perform word-for-word interpretations, errors that fundamentally alter the defendant's statements or the context of the

---

[1] In addition, Sonny argues that (1) the district court's refusal to admit Sonny's written confession to FBI agents was manifest error and a violation of his Fifth Amendment rights; (2) the district court committed manifest error by admitting evidence of prior uncharged bad acts; (3) there was insufficient evidence to support the conviction; (4) he was deprived of due process at the penalty hearing; and (5) cumulative error exists, warranting reversal of Sonny's convictions. We have carefully reviewed each of these contentions and conclude that each of these arguments lacks merit.

Furthermore, Sonny argues that the inaccuracies in translation violated his right to effective assistance of counsel. On direct appeal, this court does not address claims of ineffective assistance of counsel. *See Archanian v. State*, 122 Nev. 1019, 1036, 145 P.3d 1008, 1020-21 (2006) ("This court has repeatedly declined to consider ineffective-assistance-of-counsel claims on direct appeal unless the district court has held an evidentiary hearing on the matter or an evidentiary hearing would be needless.")

statements will render the interpretation inadequate. *Id.* at 614-17, 137 P.3d at 1142-44. We adopted a three-step procedure for courts and parties to follow when a defendant objects to the admissibility of translated statements, alleging inaccuracies in the translation. *Id.* at 609-10, 616-17, 137 P.3d at 1139, 1144.

Today we adopt similar procedures that will allow a defendant who discovers interpreter inaccuracies in the translation of trial testimony to file a post-trial motion to challenge the alleged inaccuracies made by the court-appointed interpreter. If there is a challenge to the interpreter's translation of the trial testimony, the challenging party should either move for a new trial under NRS 176.515 if the translation inaccuracies are discovered within the applicable time frame or, in the alternative, move to modify or correct the trial record on appeal pursuant to NRAP 10(c).[2]

*Motion for new trial*

If a motion for new trial is filed under NRS 176.515, the three-step procedure adopted in *Baltazar-Monterrosa* applies. First, each party should have its own interpreter review the translated testimony for discrepancies. *Baltazar-Monterrosa*, 122 Nev. at 616, 137 P.3d at 1144. If discrepancies exist, "[t]he party seeking [a new trial] has the burden of demonstrating the *inaccuracy* of the statements and that it *fundamentally alters* the substance of the [testimony]." *Id.* (emphases added). "Second, the district court should appoint an independent and, if available, certified court interpreter to review the translations." *Id.* To determine whether the moving party has met its burden, the district court must "consider the disputed versions of [the testimony] to determine whether alleged inaccuracies or omissions fundamentally alter the context of the [testimony]," *id.* at 616-17, 137 P.3d at 1144, and whether the inaccuracies prejudiced the defendant such that a new trial is warranted. *U.S. v. Gomez*, 908 F.2d 809, 811 (11th Cir. 1990) (affirming the defendant's conviction despite some resulting prejudice from interpreter error because "the evidence against the [defendant] was, in all other respects, overwhelming"). Third, the district court should preserve a copy of each

---

[2]We note that if translation errors are discovered during trial, the defendant should not wait to object. Absent a contemporaneous objection at trial, courts are less likely to find that inaccuracies in the translation of trial testimony rendered a defendant's trial fundamentally unfair. *See U.S. v. Joshi*, 896 F.2d 1303, 1310 (11th Cir. 1990); *accord U.S. v. Lim*, 794 F.2d 469, 471 (9th Cir. 1986). "To allow a defendant to remain silent throughout the trial and then, upon being found guilty, to assert a claim of inadequate translation would be an open invitation to abuse." *Valladares v. U.S.*, 871 F.2d 1564, 1566 (11th Cir. 1989).

translation for the record on appeal. *Baltazar-Monterrosa*, 122 Nev. at 617, 137 P.3d at 1144.

*Motion to modify or correct the trial record*

When, as in this case, the inaccuracies are discovered during a pending appeal from the judgment of conviction, the challenging party should move to amend or correct the trial record pursuant to NRAP 10(c). In this situation, we adopt a similar but slightly altered procedure patterned after *Baltazar-Monterrosa* that should be followed in addressing translation inaccuracies under NRAP 10(c). The procedure we adopt also looks to the more detailed language in the analogous Rule 10(e) of the Federal Rules of Appellate Procedure. First, the challenging party should file a motion with the district court to modify or correct the trial record. NRAP 10(c). Second, each party should have its own interpreter review the translated testimony for discrepancies. *Baltazar-Monterrosa*, 122 Nev. at 616, 137 P.3d at 1144. If discrepancies exist, ''[t]he party seeking [modification or correction to the record] has the burden of demonstrating the *inaccuracy* of the statements and that it *fundamentally alters* the substance of the [testimony].'' *Id.* (emphases added). Third, where possible, the parties should determine and stipulate to the translation that is more accurate. *See* FRAP 10(e)(2)(a). Fourth, in the event that the parties are unable to stipulate to an accurate translation, ''the district court should appoint an independent and, if available, certified court interpreter to review the translations,'' *Baltazar-Monterrosa*, 122 Nev. at 616, 137 P.3d at 1144, and the district court should make findings and determine which translation accurately reflects the testimony at trial and certify that translation as part of the record for review. *See* NRAP 10(c); FRAP 10(e)(2)(b). Fifth, the district court should preserve a copy of each translation for the record on appeal. *Baltazar-Monterrosa*, 122 Nev. at 617, 137 P.3d at 1144.

In this case, the district court never reviewed or made any findings to determine whether the re-translation was accurate or fundamentally altered the testimony at trial. However, the State stipulated to accept the re-translation without further evidentiary findings by the district court. Therefore, under the limited circumstances of this case, we accept the re-translation as part of the record.

On appeal, Sonny raises several interpretation errors, some of which were identified during trial. During Sonny's testimony, it was noted three separate times that the interpreter was not translating all the proceedings for Sonny or adequately interpreting Sonny's testimony to the jury. Specifically, Sonny contends that the court-appointed interpreter omitted certain words from his trial testimony

in some instances and reported summaries rather than verbatim accounts of his testimony in others. It was also noted at trial that the interpreter answered questions that had not been asked, that he answered questions on his own without waiting for Sonny to answer, and that he editorialized when translating Sonny's answers. Although Sonny did not formally object at trial, concerns about the adequacy of the translation were brought to the district court's attention, and the court admonished the interpreter for failing to accurately and properly translate the entirety of Sonny's testimony and the court proceedings.

However, Sonny asserts that he discovered the most egregious errors post-judgment, after he hired an independent interpreter to retranslate his trial testimony. Sonny's independent interpreter indicated that the court-appointed interpreter made numerous interpretation errors that, combined with the State's impeachment based on the translation errors, called Sonny's veracity into question.[3] We conclude that most of the interpretation errors were technical.

For example, Sonny argues that a translation error allowed the prosecutor to challenge his credibility with respect to whether he had talked to a friend about Raynna flirting with another man. Sonny testified that he spoke about his relationship with Raynna to certain friends. On cross-examination, the prosecutor asked Sonny whether he had spoken with a particular friend about Raynna's flirting with another man. According to Sonny's independent interpreter, when the trial interpreter translated the question for Sonny, the trial interpreter used the Laotian term for ''tempting'' instead of ''flirting.'' In response to the question, Sonny adamantly answered that he had never had such a conversation with his friend. And when the prosecutor asked twice more whether Sonny was ever concerned about Raynna flirting with other men, the interpreter did not use the Laotian term for flirting, but instead used the terms signaling ''get close to'' and ''like each other.'' To contradict Sonny's testimony, the State then called Sonny's friend as a witness, who reluctantly testified that Sonny had spoken to him approximately one month before the shooting about Raynna flirting with another man. Because of the interpreter errors, Sonny argues that his veracity was wrongly called into question. However, because the erroneously interpreted terms were similar and the interpretation of the trial testimony in its entirety was sufficiently accurate and adequate, we conclude that the

---

[3]Sonny cites specific interpretation errors of testimony concerning (1) Sonny's knowledge that Raynna owned two guns, (2) the status of his personal property, (3) the meeting and conversations with Raynna in the days preceding the shooting, (4) Sonny's relationship with Raynna, and (5) Sonny's drug use. We have considered these interpretation errors and conclude that they are technical and do not fundamentally alter the trial testimony.

interpretation errors were technical and did not fundamentally alter the trial testimony.

As another example, Sonny argues that a translation error allowed the prosecutor to dispute his veracity concerning the time at which he met Raynna at the Gold Spike Casino the Monday before the shooting. According to Sonny's independent translator, Sonny said that he met Raynna sometime in the afternoon, but he couldn't remember what time. However, the trial interpreter translated Sonny's testimony by stating that Sonny met with Raynna at the Gold Spike Casino in the afternoon at approximately 4 p.m. The prosecution then rebutted and attempted to contradict Sonny's translated testimony by submitting into evidence records showing that Raynna clocked into work on the Tuesday before the shooting at 7:41 p.m. We conclude that Raynna's actions on Tuesday evening do not contradict Sonny's testimony about the events that occurred on Monday afternoon and, therefore, the interpreter's error did not have the effect of impugning his veracity in front of the jury.

While most of the errors or categories of error are not prejudicial, we do identify one error that warrants a more thorough discussion, namely, the interpreter's translation of Sonny's testimony regarding the firing of the gun and the questions related to that testimony. But under the test we adopt in this opinion, we conclude that although Sonny demonstrated that the inaccuracies in translation fundamentally altered the context of his statements as to this interpretation error, he has not demonstrated prejudice sufficient to warrant a new trial because there was overwhelming evidence of guilt. *See U.S. v. Gomez*, 908 F.2d 809, 811 (11th Cir. 1990); *see also U.S. v. Long*, 301 F.3d 1095, 1105 (9th Cir. 2002).

During cross-examination, Sonny was questioned extensively concerning his actions after he shot Raynna in the leg, and when he shot Raynna in the head. The State repeatedly asked Sonny whether he remembered cocking the gun a second time, aiming the gun, and pulling the trigger. According to Sonny's independent interpreter, the court-appointed interpreter made a series of mistakes in interpreting the State's questions to Sonny and interpreting Sonny's responses. First, the court-appointed interpreter used a colloquial term to refer to the "hammer" of a gun, a word that neither Sonny nor his independent interpreter appeared to recognize. Second, the State called the gun a "single action only gun," and the court-appointed interpreter misinterpreted this as a "one-shot-at-a-time" gun. Third, the court-appointed interpreter used several different terms to refer to the "cocking" of the gun, only one of which, according to his independent interpreter, Sonny understood. Finally, the State used the phrase "pulled the trigger" multiple times when questioning Sonny regarding his knowledge that he was aiming at Raynna when he fired the second shot. According to Sonny's interpreter, the court-

appointed interpreter misinterpreted the phrase "pulled the trigger" as "shot."

After reviewing the trial transcript, the independent translator claimed that Sonny misunderstood "cocking the gun" to mean "pulling the trigger" and that the culmination of the court-appointed interpreter's mistakes made it appear as though Sonny acknowledged re-cocking the gun on the second shot when it was his testimony that he did not re-cock the gun. Sonny further argues that the State used his misinterpreted answers to prove he acted with premeditation when he shot and killed Raynna.

Under the test we adopt today, Sonny has the burden to demonstrate that the court-appointed interpreter's translation was inaccurate and that the discrepancies fundamentally altered the substance of his testimony. Sonny's primary defense throughout the trial was the absence of premeditation. But because Sonny misunderstood the translator and because the translator mistranslated Sonny's testimony, Sonny appeared to have unintentionally admitted "re-cocking" the gun, which the State used as evidence of Sonny's premeditation. Therefore, we conclude that the court-appointed interpreter's errors did fundamentally alter the context of Sonny's testimony.

However, we determine that Sonny's characterization of his actions and the court-appointed interpreter's inaccuracies in translation of his testimony were not prejudicial and therefore a new trial is not warranted in this case. At trial, a ballistics expert testified regarding the design of the gun Sonny used to shoot Raynna. The expert explained that in order to fire the gun a second time, it must be re-cocked. Additionally, in his statement to the Las Vegas Metropolitan Police, Sonny admitted that he fired the gun two times, perhaps even three times. Therefore, even if the court-appointed interpreter had correctly translated Sonny's testimony that he did not re-cock the gun, Sonny's explanation would be contradictory and perhaps impossible given the expert testimony regarding the design of the gun. Thus, overwhelming evidence supports the conclusion that Sonny acted with premeditation. Consequently, we conclude the result at trial would have been the same had the translator correctly translated Sonny's testimony.

*The district court's failure to instruct the jury on afterthought robbery did not affect Sonny's substantial rights*

Sonny argues that the district court abused its discretion, in part, by instructing the jury on the felony-murder rule. Specifically, Sonny argues that he objected to the district court's decision at the time it was made because his intent to commit the robbery arose only after the shooting. The State responds that the felony-murder instruction was proper because evidence was adduced to support a conviction on that theory.

This court reviews a district court's decision to issue or not to issue a particular jury instruction for an abuse of discretion. *Crawford v. State*, 121 Nev. 744, 748, 121 P.3d 582, 585 (2005). "[T]he defendant in a criminal proceeding is entitled to have the jury instructed on his theory of the case if it finds support in the evidence." *Vincent v. State*, 97 Nev. 169, 170, 625 P.2d 1172, 1173 (1981).

We conclude that the district court did not abuse its discretion by issuing an instruction on the felony-murder rule because the State adduced sufficient evidence to warrant the instruction. However, given the facts of this case, we also consider whether the district court erred by failing to instruct the jury on afterthought robbery. *See Emmons v. State*, 107 Nev. 53, 61, 807 P.2d 718, 723 (1991) (noting that this court "may address plain error or issues of constitutional dimension sua sponte"), *overruled on other grounds by Harte v. State*, 116 Nev. 1054, 1072, 13 P.3d 420, 432 (2000).

The failure to instruct the jury on afterthought robbery amounts to judicial error. *Nay v. State*, 123 Nev. 326, 333, 167 P.3d 430, 435 (2007). However, because Sonny failed to object or propose an instruction on afterthought robbery, we will reverse the judgment only upon a showing of plain error. *See Anderson v. State*, 121 Nev. 511, 516, 118 P.3d 184, 187 (2005). Under plain error review, the error must be clear from the record and adversely affect a party's substantial rights. *Id.*

In *Nay*, we concluded that robbery may not serve as a predicate for felony murder where the evidence shows that the accused killed a person and only later formed the intent to rob that person. 123 Nev. at 333, 167 P.3d at 435. However, we concluded that a fact-finder may infer the intent to commit the enumerated felony based on the defendant's actions during and immediately after the killing. *Id.* Therefore, the failure to instruct the jury on afterthought robbery is not prejudicial where there is sufficient evidence of the defendant's actions during and immediately after the killing, and where, clearly, "beyond a reasonable doubt[,] . . . the jury would have convicted [the defendant] of first-degree murder if it had been properly instructed." *Id.* at 333-34, 167 P.3d at 436.

In this case, we conclude that the district court erred by failing to instruct the jury on afterthought robbery. However, we conclude that the error did not adversely affect Sonny's substantial rights because the record demonstrates beyond a reasonable doubt that a rational jury would have convicted Sonny of first-degree murder even if it had been properly instructed on afterthought robbery for purposes of felony murder.

The State adduced sufficient facts to demonstrate that, on the night of the killing, Sonny went to a lounge in Las Vegas specifically to confront Raynna about alleged lies she had told him. After he arrived at the lounge, and after arguing with Raynna, Sonny shot Raynna in the leg. Then, after pointing the handgun at other patrons and telling them to go inside the lounge, Sonny shot Raynna a second time. It was only after he shot Raynna two times that he took her car keys and drove her car from the scene. Based on these facts, we cannot say that the State presented sufficient evidence for the jury to infer beyond a reasonable doubt that Sonny formed the intent to rob Raynna before or during the commission of the killing. Thus, although the State adduced sufficient evidence to show that Sonny was guilty of robbery with a deadly weapon, *see* NRS 200.380 and NRS 193.165, it is not possible to conclude that the jury would have convicted Sonny of felony murder had it received an instruction on afterthought robbery pursuant to *Nay*.

However, we conclude that based on the facts adduced by the State, the jury would have nevertheless convicted Sonny of first-degree murder even if it had been instructed on afterthought robbery. The jury was instructed on alternative theories of first-degree murder—felony murder and willful, deliberate, and premeditated murder. Although we conclude that the State did not introduce sufficient evidence for the jury to conclusively find that Sonny was guilty of first-degree murder committed in the perpetration of a robbery, we determine that the State adduced sufficient evidence for the jury to conclude, beyond a reasonable doubt, that Raynna's murder was perpetrated by a willful, deliberate, and premeditated killing. Sonny went to Raynna to confront her about alleged lies she told him. He purposefully carried a handgun to the confrontation. Sonny shot Raynna in the leg, and then, after time for reflection, during which he told patrons of the lounge who came outside to view the scene to go back inside, shot Raynna a second time in the head. This evidence overwhelmingly demonstrates that the killing was willful, deliberate, and premeditated. *See Byford v. State*, 116 Nev. 215, 236-37, 994 P.2d 700, 714 (2000) ("Deliberation is the process of determining upon a course of action to kill as a result of thought, including weighing the reasons for and against the action and considering the consequences of the action. . . . Premeditation is a design, a determination to kill, distinctly formed in the mind by the time of the killing.")

Thus, we conclude that the district court's failure to instruct the jury on afterthought robbery as it applies to felony murder, although erroneous, did not prejudice Sonny's substantial rights and therefore did not amount to plain error. Based on the overwhelming evidence that the killing was willful, deliberate, and premeditated, we affirm Sonny's conviction of first-degree murder. *See Cortinas v.*

*State*, 124 Nev. 1013, 1029, 195 P.3d 315, 326 (2008), *cert. denied*, 130 S. Ct. 416 (2009).

### CONCLUSION

Guided by the procedures set forth in *Baltazar-Monterrosa*, we adopt procedures pursuant to NRS 176.515 and NRAP 10(c) to review the translation of trial testimony in cases where the defendant discovers post-judgment that there were interpreter inaccuracies. These procedures will allow the defendant an opportunity to file a post-trial motion to challenge the inaccuracies made by the court-appointed interpreter.

In this case, we conclude that some of the inaccuracies fundamentally altered the context of Sonny's testimony. However, there was overwhelming evidence of guilt for the jury to convict Sonny of robbery and first-degree murder, both with a deadly weapon; therefore, the court-appointed interpreter's inaccuracies in the translation of Sonny's trial testimony do not warrant a new trial because the errors were not prejudicial.

Further, the failure to instruct the jury on afterthought robbery did not amount to plain error. We conclude that based on the overwhelming evidence of a premeditated, willful, and deliberate killing, a rational jury would have convicted Sonny of first-degree murder despite not being properly instructed on afterthought robbery for purposes of felony murder. Accordingly, we affirm the district court's judgment of conviction.

PARRAGUIRRE and DOUGLAS, JJ., concur.